UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DANA M. PORTER, )
)
   Plaintiff, )
)
vs. ) CV 01-BU-2412-S
)
MUTUAL SAVINGS LIFE )
INSURANCE COMPANY, )
)
   Defendant. )

# MEMORANDUM OPINION

This case is presently pending before the Court on Defendant's motion for summary judgment. Doc. 11. Plaintiff Dana M. Porter filed this case against her former employer, Defendant Mutual Savings Life Insurance Company, alleging that she was terminated because she was pregnant, which is a violation of Title VII.[1] For the reasons set forth below, the Court finds that Defendant's motion for summary judgment is due to be granted.

---

[1] Title VII provides, "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise." 42 U.S.C. § 2000e(k) (also known as the Pregnancy Discrimination Act).

I. **SUMMARY JUDGMENT STANDARD**

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; 106 S. Ct. at 2553; *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the

nonmoving party and resolve all reasonable inferences in the nonmovant's favor. *Rooney v. Watson*, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing *Hale v. Tallapoosa Co.*, 50 F.3d 1579, 1581 (11th Cir. 1995)).

II. **STATEMENT OF FACTS**

A. **GENERAL BACKGROUND**

Plaintiff began working for Defendant as a file clerk in its Claims Department in April 1996. Her duties as a file clerk included pulling files and filing paperwork. Approximately a year later, Plaintiff became the payroll disbursement clerk in the Payroll Department; her immediate supervisor was Waylon Kyle. Neither the file clerk position nor the payroll disbursement clerk position required Plaintiff to balance or post payments received from insurance policyholders.

In December 1999, Plaintiff applied for and received the position of payment processing clerk position in the Premium Accounting Department. She continued under the supervision of Kyle in this new position.

The Premium Accounting Department is responsible for processing and posting payments that Defendant receives from insurance policyholders. Plaintiff's job duties as the payment processing clerk consisted of posting those payments to the proper accounts and balancing her work at the end of each day.

Plaintiff testified that an employee may take anywhere from two to six months to learn the payment processing clerk job. Employees receive on-the-job training. Plaintiff contends that she was not trained properly on how to post certain

payments. She contends this lack of training was exacerbated by the lack of written procedures describing how to post payments to out-of-benefis policies.

If an insurance policy is live and current, the payment processing clerk posts any payment received by Defendant. If, however, the policy is over 90-days delinquent, Defendant returns to payment to the policy holder. When a policy is "out of benefit" (*i.e.* lapsed, paid up, extended or reduced), Defendant does not post any payment received for such policy unless the payment is enough to bring the policy current or "revive" the policy. Plaintiff refers to these as "revival policies". If the payment received is not enough to revive the policy, Defendant mails it back to the policy holder.

Plaintiff admits she had problems determining whether a payment should be posted for revival policies and that she never understood the procedures.

In March of 2000, Bruce Lea became Plaintiff's supervisor when he transferred to the premium accounting department as a manager. Lea testified that, "immediately upon arrival," he observed Plaintiff having problems in balancing and posting payments. Doc. 15, p. 11. Lea testified that he had observed that Plaintiff had a problem balancing in a timely manner approximately two or three time per week; however, she eventually balanced. He also noticed that she had problems determining when payments to revival policies should be posted on an almost daily basis. He did not hold any formal meetings with Plaintiff to go over departmental procedures or his expectations from her after observing these alleged problems.

However, on an almost daily basis, Plaintiff did discuss with Lea whether to post a payment on these accounts.

Plaintiff contends that, prior to April 17, 2000, Lea did not tell her specifically that he was concerned about her job performance. Although Plaintiff went to Lea and her co-workers with specific questions regarding the out-of-benefit policies, Lea did not seek her out to tell her this was a problem or to give her guidance. Plaintiff testified that, despite asking for help, she never really understood the posting procedures for revival or out-of-benefit policies.

Plaintiff contends that she knew the procedures for balancing and the parties do not dispute that she actually balanced her work. However, Lea testified that he observed that Plaintiff had problems balancing in a "timely" manner. Lea believed that Plaintiff's problems stemmed from her lack of organization. He told Plaintiff that in order to balance in a timely manner she should keep all of the payments received from policyholders in the same order in which she keyed them. That way, if at the end of the day Plaintiff was out of balance, she could look at a printed report, flip through the payments, and easily match them to the entries to determine where a mistake was made.

On April 17, 2000, Lea met with Plaintiff to go over her annual performance evaluation. In this meeting, he told Plaintiff he was aware that she was having some trouble with payments regarding revivals. Plaintiff contends that the only discussion

she had with Lea regarded out-of-benefit policies and that he did not discuss any problem she had timely balancing.

Plaintiff's evaluation was a good one, with many positive comments. Of the eleven categories in which Lea evaluated Plaintiff, she received ratings of "very good" for three categories, ratings of "good" in five categories, and "needs improvement" in three categories.

When Lea gave Plaintiff her performance evaluation, he rated Plaintiff 84 points on "Quality" because of her ability to balance. Lea rated her in the "good" range for "Productivity." Although there are no comments regarding Plaintiff's Productivity score, Lea testified that this score was based on the fact that she did the job. Lea rated Plaintiff high regarding "Reliability," stating, "Dana will do what it takes to get the job done including staying late." Doc. 15, Exh. 1. Under "Initiative," Plaintiff scored a 78, in the "good" range, based on Lea's assertion that "she posted the payments and kept the payments up posted current." Doc. 15, p. 23. Plaintiff received a 75 in "Adherence to Policy" because she didn't break any safety rules or do anything that was illegal. When asked why she did not receive a higher score in the Adherence-to-Policy category, since she did not violate any of those policies, Lea stated that "75 is considered the norm. You have to be above the norm to get better than that." *Id.* In the area of "Interpersonal relationships," Plaintiff received an 88 with the comment "Dana is very cooperative." Doc. 15, Exh. 1. Lea stated that Plaintiff would not create conflicts and attempted to work well

with employees. Lea testified that Plaintiff had a pleasant personality and would come in early or stay late, as required.

Also, Lea noted a number of problems he had observed with Plaintiff's job performance over the month and a half he had supervised her. Specifically, in the "Job Knowledge" category, Lea noted "improvement needed" and wrote Plaintiff "has to be told the same thing over & over." *Id.* Likewise, in the area of "Independence" Lea rated Plaintiff as "improvement needed" and indicated Plaintiff "needs to be given direction frequently." *Id.* In the last category of the appraisal, entitled "Judgment," Lea again rated Plaintiff in the "improvement needed" category. Lea indicated, in this area, that Plaintiff "needs to work on her decision-making skills." Additionally, in the area of the appraisal entitled "specific areas of needed improvement," Lea wrote, "Dana needs to work on learning departmental procedures and following them without having to ask each time." *Id.*

No document or formula directed Lea in what numbers to give his employees in each category of their evaluations. Lea used his judgment to determine those numbers. In the three areas that Plaintiff received an "improvement needed" score, she received a 69, which was only 1 point below the good range. Plaintiff's overall rating was a 77, falling within the "good" range, which was "a little bit above average" in her overall score. Doc. 15, p. 26.

On April 17, 2000, Plaintiff told Lea she was pregnant.

After her evaluation, Plaintiff continued to have problems with determining when a payment needed to be posted to a policy. Plaintiff asked Lea and Angela Sanford, a co-worker, to assist her, but she still could not understand when a payment should be posted on certain policies, especially the revival or short changed policies.

Lea discussed Plaintiff's continuing problems with Human Resources Director Robi Leibecki. Leibecki recommended that Plaintiff be issued a Personnel Counseling Report because she was experiencing problems balancing and posting payments to revival policies, despite continuing assistance.

On June 29, 2000, Lea filled out a Personnel Counseling Report for Plaintiff. The report stated:

> FACTS WARRANTING DISCIPLINARY ACTION:
>
> Dana has been in her current position six months and is still making the same mistakes. She has trouble balancing daily and weekly. She has to get help balancing almost every week. In six months she had not learned the basic balancing procedures of her job. The normal learning curve for that position is one month. Dana has to ask the same questions over and over.
>
> OBJECTIVES:
>
> For Dana to have the knowledge and skills to balance without struggling so much and taking so much time and without having to get assistance so frequently.
>
> SUGGESTED SOLUTIONS:
>
> Dana needs to come to me when she is having a problem balancing but more importantly when we resolve the problem she

> needs to retain that knowledge and not have to come back with the same problem.

Doc. 15, Exh. 2.

Lea and Leibecki met with Plaintiff and gave her the counseling report. Leibecki told Plaintiff that they perceived she was still making the same mistakes despite being in the position for six months. Leibecki told her that she was having trouble with balancing and that she had not learned the procedures of the job. Also, Leibecki discussed with Plaintiff the fact that she still required direction on the same things. Leibecki told Plaintiff that she had "thirty days to improve and that if [she] did not improve within that time that [she] would either be relocated to a different department within the building or [she] would be dismissed." Doc. 14, pp. 126-27 & exh. 3. Plaintiff disputes that she was having trouble balancing; however, she concedes that she had problems with revival policies and asked the same questions time and time again.

Plaintiff appealed this counseling report to Leibecki. She hand-delivered a letter to Leibecki, in which she stated that she did not believe she had a problem with balancing. Plaintiff stated that she had "processed very high volume of work on [her] own and balanced that very week." Doc. 14, Exh. 6, pp. 2-3. She added that "if improvement was needed in balancing, it would have been stated in [her] evaluation, which it wasn't." *Id.*, p. 3. Plaintiff acknowledged that she was continuing to have problems with the revival policies, but argued that she was "still

learning" despite her six months in the position. *Id.* at 2. No where in the appeal does Plaintiff make any mention of her pregnancy or make any complaint that she felt she was being discriminated against because of her pregnancy or her gender.

After reviewing the appeal and discussing it with Lea and Ron Koch, Lea's supervisor, Leibecki told Plaintiff that Defendant had determined the counseling report and 30-day probation would remain in effect.

Defendant contends that Lea did not perceive an improvement in Plaintiff's performance. Plaintiff concedes that she had some continuing trouble with performing her job duties; she testified:

> Q. But you were having trouble with revivals?
>
> A. That's correct.
>
> Q. In fact, you were having trouble with revivals all the way up to your termination?
>
> A. I was still having some problems with them, yes, because I didn't fully understand on how to post that revival, how it could bring it current within thirty days.

Doc. 14, p. 174. During her 30-day probation, Lea spoke to Plaintiff about her continued performance problems at least twice.

During the 30-day probation period, Lea and Leibecki discussed the possibility of relocating Plaintiff to another position with Defendant. Lea asked three other supervisors if there were any openings in their departments for which Plaintiff

would qualify, but no other positions were available. In addition, Leibecki told Lea that she also had searched for other open positions for Plaintiff, but Defendant had no open positions for which Plaintiff was qualified.

On July 19, 2000, Lea had told Plaintiff that he and Leibecki had tried to find a suitable open position for her, but Defendant had no available relocation opportunities. And, on July 28, Lea terminated Plaintiff; she was four months pregnant at the time. Defendant contends that, after seven months in the position, numerous oral counseling sessions, a Personnel Counseling Report, and a probation period, Plaintiff's job performance never improved to an acceptable level.

Defendant has an EEO policy that does not include specific information about pregnancy and/or pregnancy discrimination. Defendant does not have a policy that specifically addresses pregnancy discrimination.

Plaintiff alleges that Angela Sanford, Doris Spinks, Kathy Darby and Brenda Cagle, non-pregnant employees in the premium accounting department under Bruce Lea, were having at least as much difficulty in performing their job functions as she was.

Sanford received a lower score than Plaintiff on her evaluation in four areas: quality, productivity, reliability, and inter-personal relationships; there is no evidence that Sanford continued to have problems in these areas after her evaluation. Furthermore, Sanford's overall score was 3.1 points higher than Plaintiff's overall

score. Lea testified that Sanford did not have trouble balancing and she understood the revival policies posting procedure.

Lea noted that Doris Spinks "seemed to take a lot of time" to perform her job duties. Spinks worked in the Payroll Department and her job duties were not the same as Plaintiff's job duties. However, Plaintiff contends that Spinks was treated more favorably than her because Lea gave Spinks "unlimited time to improve her efficiency." Doc. 17, p. 24.

Plaintiff contends that Lea was unconcerned about the length of time that Kathy Darby took to learn new responsibilities. However, nothing in the record indicates that Darby had any trouble learning her new responsibilities. Moreover, nothing in the record indicates that Darby had problems timely balancing or that she did not understand the revival policy posting procedures.

Brenda Cagle, Plaintiff's final comparator, received a score of 75.7 on her annual evaluation, which was 1.5 points lower than Plaintiff's annual evaluation score. Cagle, like Spinks, worked in the Payroll Department. Cagle had problems in the areas of productivity and job knowledge; Lea did not remember how long he gave Cagle to learn her job duties. Plaintiff argues that Cagle should have been terminated before her because Cagle had a lower evaluation score. There is no evidence that Cagle continued to have problems in the areas of productivity and job knowledge after her evaluation.

## III. **DISCUSSION**

Plaintiff claims that Defendant terminated her in violation of the Pregnancy Discrimination Act ("PDA"). In this circuit, "[t]he analysis required for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits." *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000).

Plaintiff contends that she can establish a case of pregnancy discrimination through circumstantial evidence. The circumstantial evidence standards are well established:

> *McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in ... discriminatory-treatment cases. First, the plaintiff must establish a prima facie case of discrimination. . . . The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment. [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff] was fired [for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework--with its presumptions and burdens--disappear[s], and the sole remaining issue [is] discrimination vel non . . . .
>
> Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. And in attempting to satisfy this burden, the plaintiff--once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision--must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may

> attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence. Moreover, although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142-43, 120 S.Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000)(internal citations and quotations omitted).

Defendant contends that Plaintiff cannot establish a prima facie case of pregnancy and that she cannot show that its articulated reason for her discharge is a pretext for discrimination.

### 1. Prima Facie Case

Defendant contends that it is entitled to summary judgment because Plaintiff cannot establish a prima facie case of discrimination with regard to her termination. Generally, to demonstrate a prima facie case of discrimination with regard to termination, Plaintiff must show: "(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly-situated [non-pregnant] employees more favorably; and (4) she was qualified to do the job." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999). Defendant contends that Plaintiff cannot show that she was qualified for her position and/or that she cannot show that non-pregnant employees were treated more favorably.[2]

---

[2] The Court notes that Plaintiff also may establish a prima facie case of discrimination by showing that she was replaced by a person outside her protected

### a. "Qualified to do the job"

Defendant contends that Plaintiff was not "qualified to do the job" because "she never understood her job and was unable to grasp the concepts of the job." Doc. 12, p. 15. This argument misinterprets Eleventh Circuit caselaw regarding the "qualified" prong of the prima facie case. In this Circuit:

> Our caselaw quite clearly instructs that plaintiffs, who have been discharged from a previously held position, do not need to satisfy the *McDonnell Douglas* prong requiring proof of qualification. We have explained that the reason for this modification of *McDonnell Douglas* is that in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred. We have also held that allegations of poor performance against plaintiffs discharged from long-held positions may be properly considered, only after a prima facie case has been established, when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination.

*Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1360 (11th Cir. 1999)(internal quotations and citations omitted); *see also Pace v. Southern Railway System*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983)("[I]n discharge and demotion cases, where a plaintiff has held a position for a significant period of time, qualification for *that* position, sufficient to satisfy the test of a prima facie case can be inferred. However, where the position sought has not been held previously [such as in failure to

---

class. *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984). However, Plaintiff has not chosen to pursue this method of establishing a prima case of discrimination with regard to her termination.

promote and failure to hire cases] there is no basis for an inference of qualifications.") (emphasis added).

At the time Plaintiff was terminated on July 28, 2000, Plaintiff had been performing the job duties of a payment processing clerk since December 1999 and, during that period, she had been evaluated at a "good" level. The Court finds Plaintiff was "qualified" for the position of payment processing clerk, for purposes of establishing a prima facie case of discrimination. The issue of whether or not she was "disqualified" because of her alleged performance problems is reserved for the Court's "evaluat[ion of] the pretextual nature of [Defendant's] proffered nondiscriminatory reasons for [Plaintiff's] termination." *See Damon*, 196 F.3d at 1360.

### b. Similarly-situated employees.

Defendant contends that Plaintiff cannot establish a prima facie case of discrimination because she "cannot establish that any similarly situated non-pregnant employee was ever treated more favorably than her." Doc. 12, p. 15. Plaintiff contends that she was similarly situated to non-pregnant employees who had "trouble . . . performing their job duties," Doc. 17, p. 28, but who were not terminated and/or were given a longer time to learn their job duties. Defendant contends that such employees are not similarly situated to Plaintiff because "no other employee . . . had performance problems of the same magnitude as Plaintiff." Doc. 18, p. 10.

Plaintiff has the burden "'to show a similarity between [her] conduct and that of [the comparators] who were treated differently and not on [the defendant] to disprove their similarity.'" *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989)(quoting *Tate v. Weyerhauser*, 723 F.2d 598, 603 (8th Cir.1983), *cert. denied*, 469 U.S. 847, 105 S. Ct. 160, 83 L. Ed. 2d 97 (1984)).

> "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)), *opinion modified by* 151 F.3d 1321 (11th Cir. 1998). "The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (citations and quotations omitted). In order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *See Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (citation omitted); *see also Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

*Silvera v. Orange County School Board*, 244 F.3d 1253, 1259 (11th Cir.), *cert. denied* 122 S. Ct. 402, 151 L. Ed. 2d 305 (2001). Plaintiff must not only show that the nature of the misconduct was nearly identical, but also show that the "quantity and quality" of the misconduct was nearly identical.

As stated above, Defendant does not deny that these employees had job performance problems; however, Defendant contends that the comparators are not

similarly situated to the Plaintiff because (1) their problems with work performance were not of the same "magnitude" as Plaintiff's problems, and/or (2) they improved after evaluation. Defendant contends:

> According to Mr. Lea, none of [Plaintiff's] co-workers performed as poorly as Plaintiff. Plaintiff contends that Kathy Darby, Angela Sanford and Laura McGruder[3] had problems balancing, like she did. However, in addition to Plaintiff's inability to balance in a timely manner, Plaintiff also had almost daily problems with determining when a payment needed to be posted to a policy. Plaintiff admits that Ms. Sanford knew how to post revival policies and that she would often go to Ms. Sanford for advice on how to post a payment when she needed assistance. Plaintiff further testified that she has no knowledge on Ms. Darby's or Ms. McGruder's ability to handle the revival policies or even if it was required in their positions. Finally, Mr. Lea never had the persistent problems with Ms. Darby's, Ms. Sanford's or Ms. McGruder's ability to perform their basic job functions, like he did with Plaintiff.

Doc. 12, p. 16 (footnote added; citations omitted).

Plaintiff has not presented evidence to rebut Defendant's assertion that her job performance problems were the same – in quantity and quality – as her comparators. Therefore, the Court finds that Plaintiff cannot establish a prima facie case of pregnancy discrimination.

---

[3]Plaintiff does not offer evidence regarding McGruder's work performance problems. *See* Doc. 17, pp. 15, 22-27. Therefore, the Court finds that Plaintiff has abandoned McGruder as a comparator.

### 2. **Pretext**

Because the Court finds that Plaintiff cannot establish a prima facie case of pregnancy discrimination, the Court pretermits discussion of whether each of Defendant's articulated reasons for her termination is pretextual.

### **CONCLUSION**

For the reasons set forth above the Court finds no disputed issues of material fact and that Defendant is entitled to judgment as a matter of law. Defendant's motion for summary judgment, Doc. 11, is due to be granted and Plaintiff's claim is due to be dismissed with prejudice.

The Court will enter an Order contemporaneously herewith in accordance with this Memorandum Opinion granting summary judgment in favor of Defendant.

DONE this 30th day of May, 2002.

_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE